Filed 10/1/13  P. v. Alcantar CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| THE PEOPLE, | F063665 |
| Plaintiff and Respondent, | |
| v. | (Fresno Super. Ct. No. F11901601) |
| JORGE ARMANDO ALCANTAR, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant was charged with, and convicted of, second degree murder with a gang enhancement.  He contends that the enhancement was not supported by substantial

evidence at trial. He further argues that the court erroneously and prejudicially denied his motion to bifurcate the gang enhancement. We disagree.

Defendant also argues that he was improperly sentenced to a 10-year prison term on the gang enhancement, and is entitled to five more days of custody credits. Respondent concedes both issues, and we agree.

We strike the 10-year prison term and order the abstract of judgment be modified to reflect an additional 5 days of presentence custody credits. As modified, we affirm the judgment.

## FACTS

## I.

## CHARGES AND ENHANCEMENT ALLEGATIONS

Defendant Jorge Armando Alcantar (defendant) was charged with one count of murder in connection with the death of Stephen Maciel (Maciel).[1] (Pen. Code,[2] § 187, subd. (a).) The prosecution also alleged that defendant personally and intentionally discharged a firearm, (§ 12022.53, subd. (c)) and did so proximately causing death. (§ 12022.53, subd. (d).) Finally, the prosecution alleged that defendant committed the murder "for the benefit of, at the direction of, or in association with any criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members …." (§ 186.22, subd. (b)(1).)

---

[1] This appeal is taken from a retrial. At the initial trial, the jury acquitted defendant of first degree murder, attempted murder, and attempted voluntary manslaughter. The court declared a mistrial as to second degree murder. The charging document in the clerk's transcript contains a second count for attempted murder. Thus, it appears the prosecution elected not to file a new information after the initial trial. Regardless, both parties agree that defendant was not retried on the second count (attempted murder)

[2] All further statutory references are to the Penal Code unless otherwise noted.

2.

## II.

## VERDICT AND SENTENCE

A jury convicted defendant of second degree murder, and found all three enhancements true. (§§ 12022.53, subds. (c), (d); 186.22, subd. (b)(1).) On the murder conviction, the court sentenced defendant to a term of 15 years to life. On the enhancement for discharging a firearm, (§ 12022.53, subd. (c)), the court sentenced defendant to a term of 20 years, but stayed the punishment. On the enhancement for discharging a firearm causing death (§ 12022.53, subd. (d)), the court sentenced defendant to a consecutive term of 25 years to life.[3] On the gang enhancement (§ 186.22, subd. (b)(1)), the court sentenced defendant to a consecutive term of 10 years. The court credited defendant with 223 actual days served.

## III.

## MOTION TO BIFURCATE

Defendant moved to bifurcate the gang enhancement from the second degree murder charge. The court denied the motion, stating:

> "Motion Number Three, motion to bifurcate the gang enhancements from the underlying offense. They are appropriately alleged in the information. I have read and considered the information. I have read and considered the preliminary hearing transcript. They appear to be appropriately alleged. They are language from the statute [*sic*]. So I will let either of you be heard, if you have additional argument, but otherwise, the the [*sic*] Motion Number Three is denied, as far as bifurcation of the gang enhancements [*sic*]."

---

[3] Respondent's brief indicates that defendant was sentenced to a consecutive term of 15 years to life on the gun enhancement, rather than 25 years to life. This is incorrect. While the minute order cited by respondent does indicate a 15 years to life sentence on the enhancement, the court's verbal pronouncement of judgment controls. (See *People v. Jones* (2012) 54 Cal.4th 1, 89.) At the sentencing hearing, the court stated: "All right. So the record is clear, I will sentence the defendant on the convicted [*sic*] Count 1, the Penal Code 187, 2nd degree, 15 years to life; that will be enhanced by *25 years to life* for the 12022.53(d) enhancement found true." (Italics added.)

# IV.

## TRIAL EVIDENCE

### A. THE SHOOTING

<u>Summary</u>

Abraham Leanos (Leanos) and Maciel were friends. Together, they walked to a liquor store to buy beer. Maciel was wearing a red outer garment, a shirt displaying a large image of a bulldog, and a Fresno State cap.[4]

Defendant was in the liquor store with his girlfriend before Maciel and Leanos arrived. As a teenager, defendant had joined the Shelltown gang – an affiliate of the Sureno gang. The Surenos and Bulldogs are rival gangs. Whether defendant was still a member of the Shelltown gang at the time of the shooting was disputed at trial.

Defendant and his girlfriend were walking towards the exit of the liquor store as Maciel and Leanos entered. There was conflicting evidence as to what happened in the crucial seconds that followed.

However, it was undisputed that defendant raised his elbow at or near the time Maciel passed him near the store's exit (hereafter, the "elbow raise.") Defendant claimed he was merely placing a cigar in his mouth. The prosecution contended that defendant intended to bump Maciel as an inter-gang gesture of disrespect known as a "hit up." Eventually, defendant shot and killed Maciel outside the liquor store.

<u>Leanos's Testimony</u>

Leanos testified at trial. Surveillance video from the liquor store was admitted into evidence and shown to Leanos during direct examination. The prosecutor asked Leanos why the video depicts him looking over his left shoulder at one point. Leanos testified that he was speaking with Maciel at the time. At this point, the only interaction

---

[4] A Fresno City Police Department detective was later asked to investigate Maciel's background and found no information that Maciel was a member of the Bulldog gang.

between Leanos and defendant was defendant's "mugging" (i.e., "[l]ooking at you in a mad face").

Leanos testified that it appeared on the video that defendant was holding what looked to be a cell phone. The prosecutor asked whether defendant was "mugging" in the direction of the cell phone or towards someone in particular. Leanos replied, "Well, he was looking in our direction. You know, I – maybe he was – I don't know, but he was looking in our direction when I seen [*sic*] him."

The surveillance video shows defendant raising his left elbow as Maciel and Leanos pass by. Leanos had not observed the "elbow raise" that night, and saw it for the first time on the surveillance footage. He never saw defendant come into physical contact with Maciel.

The video then shows defendant begin to look over his left shoulder. Maciel looked back at defendant. Defendant "started say[ing] something" "[w]hen he stepped out the door." When asked what defendant said, Leanos testified: "He was like, 'What's up, Homie. You want some? Come here. Come here. You want some?' He just kept trying to egg us on to go outside." Maciel was still looking at defendant as he spoke. Defendant continued to look at Maciel and Leanos while walking backwards. Maciel then started walking towards defendant. Leanos testified that defendant made a gesture with his hand "kind of telling us to 'come here.' "[5] At or near the time of this gesture, defendant said, "[C]ome here." Neither Maciel nor Leanos had said anything to defendant at this point.

Maciel and Leanos exited the store. Leanos walked out, hesitated, heard shots fired and ran back inside the store. He did so because he saw defendant "turning around – reaching." He told Maciel, "No. No. Don't go. Run." Leanos ran back inside the

---

[5] The trial court described a gesture Leanos made while offering this testimony as "using his right hand, his hand up in front of him, as if telling us to 'come here' waiving his fingers, motioning back toward his body in a 'come here' motion."

store.  Maciel followed behind, but Leanos did not notice him initially.  Maciel then fell to the floor and could not talk.

Abrego's Testimony

Defendant's girlfriend at the time of the shooting was Maria Abrego (Abrego).  Prior to arriving at the liquor store, she and defendant ate pizza at a nearby restaurant.  Defendant consumed one pitcher of beer.  Afterwards, they went to the liquor store.

The prosecutor showed Abrego the surveillance footage, and she identified herself and defendant on the video.  The prosecutor asked if she recalled defendant raising his left elbow as depicted in the video, and she responded, "No.  I didn't see it.…"

Once she and defendant exited the liquor store, they began to walk back towards the nearby pizza restaurant.  The video depicts defendant raising his right hand, then walking away.  Abrego turned back and saw "those two men" (i.e., Maciel and Leanos) coming out of the liquor store.  She then said, " 'Oh, they're going to come looking for a fight or something.' "  She turned again, such that she could no longer see Maciel and Leanos.  That is when she heard shots, became frightened, and crouched down.  Defendant began running down the street, and she followed.

They ended up at defendant's house, and spent the rest of the evening there.  She told a detective afterwards that defendant had said to her, "Don't worry.  Everything is going to be fine.  That happens sometimes."

Defendant's Testimony Regarding The Shooting[6]

Defendant testified that he never said anything to "the victims" that night.  Defendant testified that the "elbow raise" depicted in the video was him placing his cigar in his mouth.   His girlfriend asked him what was going on and he replied, "Just ignore it.  Just – nada.  Don't listen"  He then "kept on walking."

_____

[6] Defendant's testimony from the prior trial was read into the record.  What follows is a summation of defendant's testimony from both trials.

6.

Defendant had testified that he did not bump Maciel intentionally, and he "didn't think" he had bumped Maciel at all. He never said anything to Maciel or Leanos and "wasn't even looking at them." Defendant had walked outside the store, and Maciel and Leanos came out afterwards. The "guy in the front"[7] said, "What's up now, mother f[\*\*]ker?" Defendant thought one or both of them were going to "beat" him "up." He told his girlfriend to hurry up, in Spanish. The "guy in front" ran after defendant, with his left hand inside his pocket. Defendant believed the man had a knife or a gun. Defendant testified, "That is when I pulled out my gun and shot." He shot twice. He did not intend to kill, but he was scared and thought the man "was going to get" him.

## B. POSTARREST

Search of Defendant's Apartment

Defendant was arrested the next night. The police searched his apartment. They located a holster and live ammunition under a refrigerator in the apartment. Defendant testified at the first trial that the gun he used to shoot Maciel went into the holster found under the refrigerator. One of the live rounds of ammunition had a "soft primer strike" on it. A police detective testified that soft primer strikes are caused when a round of ammunition is ejected from the chamber of a firearm without firing it.

Cell Phone Evidence

A cell phone was recovered from defendant's person when he was arrested. The cell phone had a number of text messages that were retrieved by law enforcement using computer software. The messages were transferred to a printout, which became an exhibit.

One incoming text message, dated March 20, 2011, at 10:45 a.m. read: "Sooo..whats going on? *Neon~Moon*" The next text message on the exhibit was a

---

[7] This clearly refers to Maciel, but defendant did not use his name while testifying to these events.

7.

"sent message" (i.e., outgoing from defendant's phone), dated March 20, 11:31 a.m., which read: "I f[**]ked up"

Another incoming text message, dated March 20, 2011, at 12:13 p.m. read: "Ur always doing sum stupid when ur drunk..why don't u stop drinking n spend more time with ur kids..just sayin [¶] *Neon~Moon*" An outgoing text message dated March 20, 2011, at 1:04 p.m., read: "I know. This time it might b [*sic*] to [*sic*] late"

In an outgoing text message dated March 20, 2011, at 4:46 p.m., a text message read: "Nada. Cuida bien a mis bebes." A police detective, who is a native Spanish speaker, translated the message as follows: "It says, 'Nada,' which means 'nothing.' 'Cuida bien amis [*sic*] bebes,' which is 'Take good care of my kids' or 'babies.' "

Another outgoing text message dated March 20, 2011, at 9:07 was sent in Spanish. The police detective translated the message as, " 'The police can find me with my phone on…. I'm going to turn it on from time to time.' "

Defendant's Phone Calls From Jail

A police detective testified that inmates of the county jail are given jail identification numbers referred to as a "JID." The detective was able to retrieve all calls made with defendant's JID and reviewed them. The parties stipulated to two translated transcripts of defendant's calls from jail on March 22, 2011, and August 3, 2011. Recordings of the two calls were played for the jury. The stipulated translation of the August 3, 2011, call between defendant and "ET" contains the following pertinent statements by defendant:

> "[Defendant]: Well what do you believe … he told me, I talked to my lawyer and he told me to just tell the truth about what happened and well I didn't want to do nothing to them but [i]f they would have got me can you imagine what the both of them would have done to me. They would have f[**]kin' killed me right there.

> "ET: Um.

> "[Defendant]: I didn't do anything but defend myself … no, no, no I didn't want to kill nobody. It was the last thing that … that what more …

8.

well I was left with no other…. [T]here was no other form. What else could I have done? If I would have run they would have caught me."

Later in the call, defendant said, "They would have put me nothing … they would have f[**]kin' killed me between the both of them. And they say that I started all the shit I was on the damn phone. I didn't, I didn't even look at them or pay attention to them.…"

> "[Defendant]: I was walking, and I didn't even and he said that I hit him with my elbow. I put my damn cigar in my mouth and I didn't even … and when they said something to me well I turned around because I said what do these f[**]kers want? And I turned around to see what the f[**]k they wanted. And they were … I don't know what they were telling me but I just said "mmhha" all I did was do this with my hand like "mmhha" like [to say] go f[**]k yourself, right. I didn't pay attention to them. And that's when they came and well I went … well there is the video. I got the f[**]k out of there ….

> "ET: Yes.

> "[Defendant]: I was going to go into the pizzeria, but, but when they were coming behind me I said I had no other choice ya. I wait another minute and they would have gotten me there."

## C. GANG EVIDENCE

Photographs

Photographs were taken from defendant's cell phone and entered into evidence, including Exhibits 77 and 79. Both defendant and the gang experts testified regarding the photographs, as detailed below.

Officer Castro's Testimony

*Classification of Defendant as a Gang Member*

Rudy Castro, a San Diego police officer, testified that he investigated defendant and validated him as a member of the Shelltown 38 gang. Shelltown is considered a Sureno gang. Officer Castro testified that his criteria for validating defendant as a member of the Shelltown 38 gang were: self-identification, tattoos, and prior arrests for gang-related offenses in association with other gang members.

Officer Castro stated that in "July of 28,"**8** defendant was contacted by a police officer and claimed Shelltown gang membership and a moniker of "Flacco." A field interview report indicates that in January 2007, defendant had "a 38 on his right ring finger." Officer Castro testified that defendant's tattoo reading "38" stood for "Shelltown 38 Street."

Officer Castro also testified regarding defendant's association with known Shelltown gang members. Defendant had been contacted by law enforcement two or three times with a self-professed Shelltown gang member, Eduardo Murillo.

Officer Castro testified that defendant had been arrested for vandalism for spray painting "Shelltown 38" on a business in National City. He told the officer that he is an active member of Shelltown. Defendant last admitted gang membership in 2008.

*Shelltown Gang's Predicate Offenses*

Officer Castro testified regarding predicate offenses for the Shelltown gang.

In May 31, 2009, Shelltown gang member Cristobol Nare (Nare) was at a party, as was a Mr. Ochoa (Ochoa). Ochoa left the party and pulled into an intersection. Nare and two other individuals threw a brick through the window of Ochoa's vehicle. Nare and another individual went to the driver's side of Ochoa's vehicle and beat the victim. They displayed a handgun from the waistband, and stole a jacket and an iPod.

On December 22, 2009, three individuals were walking in the area of Shelltown. A couple "Hispanic males approached," and asked the individuals what they had in their pockets. One of the male suspects produced a knife and "wanted the property they had on them." As they were taking the property from the vicitim, the suspect "essentially" told them, "This is Shelltown." The suspect was arrested and identified as Joey Negrette, a Shelltown gang member.

---

**8** Presumably, a typographical error in the reporter's transcript.

10.

In August 2010, Johnny Nava (Nava) and Orlando Aguilar (Aguilar) walked into a food store. Aguilar took some beer and attempted to leave without paying for it. A security guard confronted them at the door, and Nava said, " 'What are you going to do? This is Shelltown.' " Nava lifted up his shirt, showing a handgun to the security guard. They were arrested minutes later.

*Exhibit 77*

Officer Castro was shown Exhibit 77, a photograph depicting defendant and a female. He testified that defendant and the female were displaying gang hand signs in the photograph. He said that defendant was making a sign indicating the number "20." This was a gang-related symbol because the letters "S" and "T" are an abbreviation for "Shelltown" and "T" is the twentieth letter of the alphabet. Officer Castro did not know whether the Chargers played on the "file date" of the photograph, December 5, 2010.

*Cross-Examination Regarding Defendant's Alleged "Move Out" from Shelltown Gang*

The following colloquy occurred on cross-examination:

"[Defense counsel]: Do you know whether or not [defendant] was ever jumped out [of the gang]?

"[Officer Castro]: No.

"[Defense counsel]: Do you know how a person leaves a gang?

"[Officer Castro]: Either die or jump out or just move out; there are several different ways.

"[Defense counsel]: San Diego is how far from Fresno?

"[Officer Castro]: About eight hours.

"[Defense counsel]: Would you consider that a 'move out'?

"[Officer Castro]: Yes."

Detective Kyle Kramer's Testimony

Fresno City Police Detective Kyle Kramer (Kramer) testified as a gang expert for the prosecution. Detective Kramer validated defendant as a gang member. Detective

11.

Kramer located six jail classification questionnaires from 2000 to 2011, which indicate that defendant identified himself as a gang member. In five of the questionnaires, the identified gang was "San Diego Sureno." In the remaining questionnaire, the identified gang was simply, "Sureno."

Detective Kramer said that a tattoo of the words Shelltown and "what appears to be a shell," are indicative of gang membership. He continued to describe the remainder of defendant's tattoos as indicative of gang affiliation.

*Exhibit 77*

Detective Kramer was shown Exhibit 77. Detective Kramer described defendant's hand positioning as "putting up two fingers, and with the remaining thumb and the pinky and the ring finger … forming … a zero. The significance of that being signifying the number 20, being the letter T for Shelltown, and the female appears to be doing the same thing." Detective Kramer testified that the photograph's "file date" of December 5, 2010, was evidence of recent gang affiliation or identification.

*Exhibit 79*

Detective Kramer was shown Exhibit 79, a photograph. He described the photograph as depicting a headstone of one, Martin Castro, Jr. Based on his conversations with an Officer Castro, Detective Kramer testified that Martin Castro, Jr., was a Shelltown gang member at the time of his death. On the headstone appears the number "192," which references the 19th and 20th letters of the alphabet.

*Gang Colors*

Detective Kramer was asked whether there are any colors of clothing associated with Surenos, other than blue. Detective Kramer responded that he has seen the use of "all black clothing" for the purposes of "trying to get away from the primary color of blue" and to "blend in with the environment" "especially at nighttime." He also said that

12.

someone could wear the color black because they did not want to associate with gangs any longer.[9]

### Sureno Gang's Predicate Offenses

The prosecutor acknowledged that there had already been testimony at trial regarding the Shelltown gang's primary activities. Nonetheless, because "Shelltown is a subset of Surenos" the prosecutor asked for an example of Sureno criminal activity in Fresno County. Kramer testified that Sureno activities in Fresno County included "drive-by shootings, possession of controlled substances and firearms, assault with deadly weapons, murders, things of that nature." He then identified specific crimes committed by Sureno gang members, including an assault with a deadly weapon on August 24, 2008; possession of a firearm on July 20, 2006; attempted murder on March 31, 2009; and arson on November 18, 2008.

### Gang Culture Testimony

Kramer spoke about the importance of respect in gang culture, where a weak reputation will lead to frequent victimization and the eventual demise of a gang. Conversely, a gang that has achieved "respect" for being violent has a number of advantages. For example, individuals are less likely to speak to the police out of fear of violent retaliation by the gang.

In order to enhance their gang's respect and reputation for violence, rival gang members will physically or verbally challenge one another. These challenges are called "hit ups." They are intentional signs of disrespect, which demand a response. If the insulted gang member does not respond to the "hit up," it is a sign of weakness in gang culture.

---

[9] Officer Castro testified that gang members do wear black, but he "wouldn't say because someone is wearing black they are gang members."

13.

A physical hit up can be one gang member bumping into a rival gang member. Examples of verbal hit ups include saying, "What's up? Come on," or "What's up essay [*sic*]?"

The prosecutor asked Kramer how shooting someone after a hit up would promote or further the Sureno gang. Kramer testified: "When you have these, the commission of these violent crimes, whether it be against somebody who is perceived to be a rival gang member, the status of the gang within the gang culture is enhanced. The violent reputation of the gang within the gang culture itself is enhanced. [¶] This does a couple of things. It instills fear really and intimidated [*sic*] not only the rival gangs, but the community that exists within that area where crime occurs; the people who frequent the area, customers, residents, things of that nature.… The result of that being they're feared [*sic*], and … not likely to cooperate with … law enforcement. They're not likely to come testify in court. They are not even likely to call the police when they hear shots fired, or that somebody could potentially be the victim of a crime. That is … what the benefit to the gang is."

*Testimony Regarding Defendant's "Elbow Raise"*

Kramer was shown the surveillance video from the night of the shooting. Kramer said that given Maciel's clothing, he would look like a Bulldog gang member to a Sureno.[10] He testified that defendant's elbow raise was a physical hit up. He noted that defendant does not challenge Leanos in the video, but instead "goes right to and makes the contact with the one that is in all red."

Defendant's Testimony Regarding Gang Issues

Defendant testified he was not "gang banging" on the night of the shooting. He has had tattoos since he was a teenager that read: "Shelltown," "38," "Tres Ocho," and "SD." He also had a tattoo of three dots. Defendant testified that when he got the

---

[10] The Shelltown gang is a "subset" of the Sureno gang. Bulldogs are rivals of the Surenos and sometimes refer to Surenos as "scrapas" (i.e., scrap of garbage).

14.

tattoos, they showed his commitment to the Shelltown gang. He did not have the tattoos removed because it would be expensive. He got the "Shelltown" tattoo when he was 17 or 18. At the time of trial he was 32.

Defendant acknowledged that he was previously a member of the Shelltown gang. At the previous trial, defendant testified that the shooting had nothing to do with his prior membership in a gang.

Defendant testified that the "elbow raise" depicted in the video was him placing his cigar in his mouth.

Defendant testified regarding Exhibit 77. He testified that he "believe[d]" that the photograph was taken December 5, 2010. Defendant was asked what he was doing with his fingers in the photograph and he replied, "That was an away Chargers game, and we just was – it was just victory; whatever you want to call it."

Amalia Gonzalez

Amalia Gonzalez is defendant's sister. She testified that she was the female depicted in Exhibit 77. She said that she has never been a member of "the Shelltown crew" and has never been a "gang banger."

She testified that defendant moved to Fresno to "be there" for his kids and to "get away from his gang." As far as she knew, defendant had "[n]othing to do with Shelltown" after he left San Diego.

Physical Evidence

When law enforcement searched defendant's apartment, they located San Diego Chargers paraphernalia, including a towel and multiple articles of clothing.

## ANALYSIS

### I.

**THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S TRUE FINDING ON THE SECTION 186.22, SUBDIVISION (b)(1) ENHANCEMENT**

Defendant contends that there was insufficient evidence to support the jury's true finding regarding the section 186.22, subdivision (b)(1) enhancement. We disagree.

15.

"When a defendant challenges the sufficiency of the evidence, ' "[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence … such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 942.) Evidence is "substantial" when it is reasonable, credible and of solid value. (*Ibid.*) Substantial evidence may include circumstantial evidence and any reasonable inferences drawn therefrom. (*Id.* at p. 943.)

Section 186.22, subdivision (b)(1) applies to individuals who commit a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1). ) In other words, it applies to "when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 68 (*Albillar*).)

Thus, the provision has two prongs. The first prong is that defendant is convicted of a felony "committed for the benefit of, at the direction of, or in association with a criminal street gang." (*Albillar*, *supra*, 51 Cal.4th at p. 67.) The second prong is a scienter requirement that the defendant committed the gang-related felony " 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (*Id.* at p. 64.)

## A. SUBSTANTIAL EVIDENCE SUPPORTED THE FIRST PRONG OF THE GANG ENHANCEMENT

Defendant relies on a number of cases for essentially the same proposition: that the elements of section 186.22, subdivision (b)(1) are not satisfied *merely* by evidence that a gang member committed a felony.[11] (See *People v. Olguin* (1994) 31 Cal.App.4th

---

[11] See appellant's opening brief at page 19 [arguing that *Olguin* recognized as "plausible" the argument that a gang member's crime was committed for personal rather than gang-related reasons]; *id.* at p. 23 [arguing that *Albarran* court "concluded that despite the evidence that the defendant was a gang member, the motive for the underlying

1355 (*Olguin*); *People v. Ochoa* (2009) 179 Cal.App.4th 650 (*Ochoa*); *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*); and *People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*).) In other words, not all crimes committed by gang members are necessarily gang-related for purposes of subdivision (b)(1).

It is true that a "gang enhancement cannot be sustained based solely on defendant's status as a member of the gang and his subsequent commission of crimes." (*Ochoa*, *supra*, 179 Cal.App.4th at p. 663.) But the jury's verdict here was supported by more. Not only was there evidence that defendant became a member of a gang and thereafter committed a crime, there was also evidence that *the specific crime* was gang-related.

At trial, the parties offered two competing theories as to the purpose of defendant's "elbow raise" near the time he passed Maciel in the store. Defendant contended that he was merely placing his cigar into his mouth. Conversely, the prosecution offered their expert's testimony that the "elbow raise" was in fact a "hit up" (i.e., gang challenge) directed to Maciel. The prosecution's suggested inference is reasonable, as we explain *post*.

In the surveillance video, Leanos does not appear to be wearing any red or any depictions of bulldogs. There appears to be no physical interaction between defendant and Leanos as they pass each other. It is only when defendant passes Maciel that physical interaction occurs.[12] Defendant raised his elbow while passing Maciel, who was wearing red outerwear, a black shirt depicting a bulldog, and a California State

crimes 'was not apparent from the circumstances of the crime.' "; *id.* at p. 24 [arguing that *Ochoa* reached same result as *Albarran* that gang membership alone could not sustain inference that crime was gang related despite expert witness's testimony to the contrary]; *id.* at pp. 24-25 [arguing that *Ramon* court held "the mere fact that the individuals involved in the crime were gang members did not suffice to prove their criminal acts were carried out in order to promote their gang"].

[12] As Kramer testified, defendant does not challenge Leanos in the video, but instead "goes right to and makes the contact with the one that is in all red [Maciel]."

17.

University – Fresno [13] hat. This evidence gives rise to the inference defendant perceived Maciel to be a member of a rival gang. [14]

The evidence showed defendant was, at least at one point in his life, a member of a the Shelltown gang, a subset of the Sureno gang. There was also evidence the Surenos and Bulldogs are rival gangs. Viewed together, this evidence gives rise to the inference defendant perceived Maciel to be a rival gang member and intentionally "hit" him "up."

When the inference supporting the judgment is reasonable, any contrary inferences are irrelevant.[15] (See *People v. Kraft* (2000) 23 Cal.4th 978, 1058.) Moreover, the jury could have even accepted both sides' proposed inferences, and concluded that defendant's elbow raise was both a "hit up" and a manner of placing the cigar in his mouth.

Regardless, we draw whichever inference supports the judgment on appeal. (See *People v. Whalen* (2013) 56 Cal.4th 1, 56, fn. 22.) Here, the judgment-supporting inference is that defendant intentionally raised his elbow in an act of hostility towards someone displaying a rival gang's color (red) and symbol (bulldog). We presume that inference is correct and that defendant did "hit up" Maciel in the seconds before the

---

[13] Fresno State's mascot is a bulldog.

[14] Defendant argues that "[a]lthough Kramer testified that to a Sureno, Maciel would appear to be a Bulldog gang member, Maciel's apparel was equally consistent with being a fan …." But simply raising alternative, innocuous explanations of the evidence is not enough to warrant reversal. (See *People v. Lopez* (2013) 56 Cal.4th 1028, 1072.) "Under the substantial evidence rule … ' "if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." ' " (*Ibid.*)

Moreover, this contention ignores the fact Maciel's clothing was not the only evidence that defendant perceived Maciel to be a gang member. Defendant passed Leanos, apparently without incident, seconds before raising his elbow near Maciel. And, defendant did not kill Leanos.

[15] Defendant testified that he was placing a cigar into his mouth. Additionally, one of the surveillance videos depicts him placing the cigar into his mouth near the time he passes Maciel.

shooting. (See *People v. Brady* (2010) 50 Cal.4th 547, 564 [on review, "we presume the existence of every fact in support of the verdict that reasonably could be inferred from the evidence"].)

Given that there was crime-specific evidence of gang-relatedness, Detective Kramer permissibly offered his opinion that a similarly-described hypothetical crime would be gang-related. (See *People v. Xue Vang* (2011) 52 Cal.4th 1038, 1052 ["[N]o statute prohibits an expert from expressing an opinion regarding whether a crime was gang related. Indeed, it is settled that an expert may express such an opinion."].)

On this topic, Detective Kramer testified that a post "hit up" shooting benefits the shooter's gang. He testified that, "[w]hen you have … the commission of these violent crimes, whether it be against somebody who is perceived to be a rival gang member, the … violent reputation of the gang … is enhanced." This testimony was sufficient. "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of … a[] criminal street gang' within the meaning of section 186.22(b)(1)." (*Albillar*, *supra*, 51 Cal.4th at p. 63. See also *People v. Xue Vang*, *supra*, 52 Cal.4th at p. 1048.)

## B. SUBSTANTIAL EVIDENCE SUPPORTED THE SECOND PRONG OF THE GANG ENHANCEMENT

*Kramer's Opinion*

Defendant argues Kramer's opinion that he "specifically intended to promote Surenos" lacks evidentiary support. This characterization of Kramer's opinion is inaccurate. Kramer testified as to how, hypothetically,[16] a post-"hit up" shooting would

---

[16] A gang expert's testimony on this issue is frequently (and appropriately) offered with respect to a "hypothetical" crime with similar facts to the charged crime. (*People v. Xue Vang*, *supra*, 52 Cal.4th at pp. 1045, 1047-1048; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1197. See, e.g., *Albillar*, *supra*, 51 Cal.4th at p. 63; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1197. Cf. *People v. Gonzalez* (2006) 38 Cal.4th 932, 946

19.

benefit the shooter's gang. We see no indication in the record that Kramer directly testified as to defendant's intent.

Rather, Kramer offered an explanation of defendant's "elbow raise" based on his knowledge regarding gang culture and habits. And, contrary to defendant's apparent contention on appeal,[17] Detective Kramer was entitled to offer that explanation. (*In re Frank S.*, *supra*, 141 Cal.App.4th at p. 1196 [expert may testify to gang culture and habits].) "It is well settled that a trier of fact may rely on expert testimony about gang culture and habits to reach a finding on a gang allegation." (*Ibid*.) " 'It is difficult to imagine a clearer need for expert explication than that presented by a subculture in which this type of mindless retaliation promotes "respect." ' " (*People v. Gonzalez*, *supra*, 38 Cal.4th at p. 945.)

There is an important difference between an expert's testimony that "a specific individual possessed a specific intent," and testimony that "give[s] meaning to the defendant's actions." (*In re Frank S.*, *supra*, 141 Cal.App.4th 1192, 1197-1198. Cf. *People v. Xue Vang*, *supra*, 52 Cal.4th at pp. 1045-1051.) Here, Detective Kramer offered one plausible explanation of defendant's elbow raise (i.e., that it was a gang "hit up"). He did not baldly assert that defendant had a particular intent.

*Substantial Evidence of Intent*

As we will explain, Kramer's testimony gave meaning to defendant's conduct and, in conjunction with the evidence of defendant's conduct itself, was sufficient to support the intent requirement of the gang enhancement statute.

---

[" 'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." ' "])

[17] Defendant cites *Ochoa*'s description of the relevant expert testimony in that case as doing " ' "nothing more than [improperly] inform[ing] the jury how [the expert] believed the case should be decided,…" ' " (See *Ochoa*, *supra*, 179 Cal.App.4th at p. 662.)

20.

" '[I]ntent is inherently difficult to prove by direct evidence. Therefore, the act itself, together with its surrounding circumstances must generally form the basis from which the intent of the actor may legitimately be inferred.' " (*People v. Edwards* (1992) 8 Cal.App.4th 1092, 1099.) " '[W]e routinely draw inferences about intent from the predictable results of action. We cannot look into people's minds directly to see their purposes. We can discover mental state only from how people act and what they say.' " (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411-412.) That is why we have recognized that "[p]roof of intent may be made by way of inferences from a defendant's volitional acts which are done with knowledge of the probable consequences ...." (*People v. Pitts* (1990) 223 Cal.App.3d 606, 892-893.)

Detective Kramer's testimony went to the "predictable results" and "probable consequences" of hitting up a rival gang member and then shooting them. The result is the gang's reputation for violence is elevated which enhances the gang's ability to commit future crimes.

There was also evidence that defendant acted with knowledge of those probable consequences. "Knowledge, like intent, is rarely susceptible of direct proof and generally must be established by circumstantial evidence and the reasonable inferences to which it gives rise." (*People v. Buckley* (1986) 183 Cal.App.3d 489, 494-495.) Here, the evidence that defendant was, at a minimum, a former gang member gives rise to a reasonable inference that defendant was familiar with gang culture and knew of the probable consequences of a "successful" hit up.[18] Thus, "although no direct evidence showed defendant acted with the required knowledge … there was substantial evidence from which a rational trier of fact could have found he in fact possessed such a mental state." (*People v. Hill* (1998) 17 Cal.4th 800, 851, overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

_____

[18] Detective Kramer testified that this type of interaction between rival gang members occurs "quite often."

In sum, there is substantial evidence supporting all of the following: (1) defendant intentionally "hit up" Maciel; (2) that a "successful" hit up enhances a gang's reputation for violence and ability to commit future crimes; and (3) defendant was, at a minimum, a prior gang member, which gives rise to the inference that he knew the benefits of a "successful" hit up to a gang. This was sufficient because, as we noted earlier, a "defendant's intentional acts, when combined with his knowledge that those acts would assist crimes by fellow gang members, afford[s] sufficient evidence of the … specific intent" required by section 186.22, subdivision (b)(1). (*People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198-1199.)

## II.

### THE TRIAL COURT DID NOT ERR IN DENYING DEFENDANT'S MOTION TO BIFURCATE

Defendant contends that the trial court's denial of his motion to bifurcate the gang enhancement from the substantive offense was erroneous and prejudicial. We disagree.

A trial court's bifurcation ruling is reviewed for abuse of discretion. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1048.) A trial court's discretion to deny bifurcation of a gang enhancement is broader than its discretion to admit gang evidence when no gang enhancement is charged. (*Id.* at p. 1050.)

Defendant argues that "the prosecut[ion's] entire theory was centered on the fact this was a gang offense motivated by gang rivalry that benefitted the Surenos and relied on gang evidence and expert opinion to do so." There is nothing wrong with what defendant describes.

There are multiple ways gang evidence is used at trial. Some uses are appropriate and others are not. For example, it is improper to introduce gang evidence to establish "the defendant has a criminal disposition and is therefore guilty of the offense charged." (*People v. Williams* (1997) 17 Cal.4th 148, 193.) But, it is not improper to introduce gang evidence to establish a defendant's motive. Even in cases where no gang enhancement is charged, "[e]vidence of the defendant's gang affiliation … can help

22.

prove … motive … specific intent … or other issues pertinent to guilt of the charged crime." (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1049.) "[I]n a gang-related case, gang evidence is admissible if relevant to motive … so long as its probative value is not outweighed by its prejudicial effect." (*People v. Williams*, *supra*, 17 Cal.4th at p. 193. See also *People v. Funes* (1994) 23 Cal.App.4th 1506, 1518.) Here, the gang evidence was used in a permissible manner: to establish motive and intent.

Defendant claimed he acted in self-defense when he shot Maciel. The gang evidence contradicted this theory. If defendant believed Maciel was a rival gang member and "hit" him "up" seconds before the shooting, the theory of self-defense becomes far less plausible. The prosecution was entitled to make this argument and present evidence supporting it. It was not inadmissible evidence of a defendant's criminal disposition, (see Evid. Code § 1101), but rather evidence of motive and intent.

As noted above, there was also evidence introduced regarding "predicate offenses" of the Surenos and Shelltown gangs. There is no question that this evidence was relevant to the gang enhancement. (See § 186.22, subd. (e).) However, as defendant points out, there was no evidence that he was involved in the predicate offenses identified by the gang experts. Thus, the predicate offense evidence had little probative value, if any, with respect to the second degree murder charge. But, defendant's noninvolvement in the predicate offenses also reduces the likelihood of undue prejudice. The evidence does not directly implicate prior criminal activity by defendant, and is therefore less likely to facilitate improper "criminal propensity" reasoning by the jury.

Ultimately, the question of whether the predicate offense evidence would have been admissible in the absence of the gang enhancement is not dispositive. "Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself – for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged – a court may still deny bifurcation." (*People v. Hernandez*, *supra*, 33 Cal.4th at

p. 1050.)  Here, the predicate offense evidence was not particularly inflammatory.[19]

Moreover, it was not evidence "of offenses for which a defendant might have escaped punishment." (*Id.* at p. 1051.)  To the contrary, there was no evidence defendant was implicated in the predicate offenses at all.

Additionally, the court instructed the jury on the limited purposes for which the gang evidence could be considered.  The court stated, "You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose and knowledge that are required to prove malice aforethought and/or the gang-related enhancement charged."  "[W]e presume the jury faithfully followed the court's limiting instruction." (*People v. Ervine* (2009) 47 Cal.4th 745, 776.)

"Even if some of the expert testimony would not have been admitted at a trial limited to guilt, the countervailing considerations that apply when the enhancement is charged permitted a unitary trial." (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1051.)

### III.

### THE 10-YEAR PRISON SENTENCE ON THE GANG ENHANCEMENT MUST BE STRICKEN

Defendant argues, and respondent concedes, that the 10-year prison term on the gang enhancement must be stricken.  We agree.

The additional 10-year term of "[s]ection 186.22(b)(1)(C) does not apply … where the violent felony is 'punishable by imprisonment in the state prison for life.' [Citation] Instead, section 186.22, subdivision (b)(5) … applies and imposes a minimum term of 15 years before the defendant may be considered for parole." (*People v. Lopez* (2005) 34 Cal.4th 1002, 1004.)

---

[19] Detective Kramer's testimony regarding prior offenses by Sureno gang members was essentially limited to the name of the offender, type of offense (e.g., "assault with a deadly weapon"), applicable statute, and date of offense.  Detective Kramer did not testify to any inflammatory details of the crimes.

**IV.**

**DEFENDANT IS ENTITLED TO FIVE ADDITIONAL DAYS OF SENTENCE CUSTODY CREDIT**

Defendant argues, and respondent concedes, that he is entitled to five additional days of presentence custody credit. We agree.

Defendant was arrested March 21, 2011, and sentenced on November 3, 2011. Yet, he was credited with 223 days in custody rather than 228 days.

**DISPOSITION**

The abstract of judgment shall be amended to reflect five additional days of custody credit. The sentence shall be modified to delete the 10-year gang enhancement imposed under Penal Code section 186.22, subdivision (b)(1)(C). (See *People v. Lopez*, *supra*, 34 Cal.4th at p. 1011.) The judgment is affirmed, as modified. The matter is remanded to the trial court to amend the abstract of judgment accordingly and to transmit certified copies of the amended abstract to all appropriate parties and entities.

_____
Poochigian, Acting P.J.

WE CONCUR:


_____
Detjen, J.


_____
Franson, J.

25.